(C. D. 282)

NICHOLS COPPER Co. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 6, 1940)

*Jerome G. Clifford* (*George W. Israel* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, AND DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation described in the *pro forma* invoice as "bulk silver ores, weighing 705525 kilos." The merchandise was classified free of duty under the provision in paragraph 1734 of the Tariff Act of 1930 for "Ores of gold, silver, or nickel," but a duty of 1½ cents per pound upon the zinc contained therein was levied under paragraph 393 of said act, the pertinent portion of which reads:

Zinc-bearing ores of all kinds, except pyrites containing not more than 3 per centum zinc, 1½ cents per pound on the zinc contained therein: *Provided*, That such duties shall not be applied to the zinc contained in lead or copper ores unless actually recovered: * * *.

Apparently the only claim in the protest relied upon by the plaintiff is that alleging free entry for the merchandise under the following paragraph of said act:

PAR. 1664. Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

Samples of each one of the four lots constituting the imported merchandise at bar were analyzed by the Government chemist, whose report is annexed to the official papers and, so far as here pertinent, reads as follows:

| Lot No. | % Copper | % Lead |
|---------|----------|--------|
| 138 | trace | ---- |
| 139 | " | 1. 00 |
| 140 | " | 1. 15 |
| 141 | " | 0. 80 |

Average Zinc contents 10.00%.

In addition, there was admitted in evidence as Collective Exhibit 1 a report showing the chemical analysis of the four lots in question made under the supervision of Carlton S. Harloff, work manager of the plaintiff-corporation. In this analysis there is no mention of the zinc content; but it was agreed by and between counsel for the respective parties in open court that the Government chemist's finding of an average of 10 per centum zinc contained in the merchandise was correct.

The plaintiff also offered in evidence the testimony of two witnesses. The first, the said Carlton S. Harloff, testified that the merchandise in question contained less than one-tenth of one per centum of copper and less than one per centum of lead; that the analysis made under his supervision (Collective Exhibit 1) was made for the purpose of determining the silicate, iron, lime, and silver contents; that the average silicate content in each lot was about

60 per centum; that all four lots of material comprising the merchandise at bar went into the blast furnace of his company's smelter situated at Laurel Hill, Long Island, N. Y.; that the said smelter was specially equipped for the recovery of copper; that the merchandise at bar was a siliceous flux containing a high percentage of silicon, and was used as a flux in smelting for copper; that his company's plant was not equipped to recover zinc; that the zinc in the imported merchandise at bar was wasted either in fumes which went up the smokestack or was thrown out as slag; and that in the smelting for copper his company recovered a considerable amount of silver.

On cross-examination the witness testified that in the smelting for copper some gold or silver was recovered; and that in smelting for copper it is necessary to use a considerable quantity of copper concentrates in order to introduce into the process an excessive amount of iron which must be balanced by means of a siliceous flux like the imported merchandise herein.

The witness further testified on cross-examination as follows:

By Mr. FitzGibbon:

X Q. When this merchandise was imported, it was invoiced as silver ore, was it not?—A. I don't recall the invoice. I presume that is the reading.

Mr. Israel: I will concede that.

By Mr. FitzGibbon:

X Q. Was it an ore?—A. As far as I am concerned, in this processing it was a fluxing material only. It was not an ore.

X Q. Don't you use ore sometimes for fluxing purposes?—A. A material that is flux, may or may not be an ore.

X Q. Was this an ore?—A. As far as this plant was concerned, as far as the recovery is concerned, it was not an ore.

\*          \*          \*          \*          \*          \*          \*

X Q. Was this an ore that could be used as a flux?—A. I would call it a metallic mineral and not an ore.

Mr. FitzGibbon: I move to strike out the answer.

Judge Dallinger: Strike it out. Answer the question.

The Witness: It is not an ore.

By Mr. Fitzgibbon:

X Q. Although it is invoiced as an ore, you say it is not an ore?—A. That is correct.

The second plaintiff's witness, Philip B. Scott, a qualified metallurgical engineer and ore buyer for the plaintiff-corporation testified in part as follows:

By Mr. Israel:

Q. Are you familiar with the merchandise involved in the instant case?—A. Yes.

Q. How would you describe this merchandise?—A. This merchandise was a siliceous silver-bearing ore.

Q. You say siliceous because it contains about 60 percent?—A. Siliceous silver.

Q. And its primary function is what?—A. To provide silicate to our smelter.

Q. That is the purpose for which you purchased it?—A. Right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Judge DALLINGER: Couldn't you get silicate in a cheaper form than the one containing a tenth of a per cent of gold and silver?

The WITNESS: At times, yes Your Honor. That is a question of markets and a question of conditions. If I may elaborate, we formerly used bar sand and gravel for the purpose of supplying silicate for the smelter, which is more expensive to us.

Judge DALLINGER: You mean that cost you more than this ten percent zinc.

The WITNESS: Yes, sir.

By Mr. ISRAEL:

Q. How much does this ore cost you a ton?—A. This ore—we paid $18.25 per ton.

Q. How much silver and gold did you recover?—A· Approximately $21.00.

Judge TILSON: From the whole order?

The WITNESS: Per ton.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Judge KINCHELOE: You also got copper, didn't you?

The WITNESS: No, sir, the assay shows that there was no copper in this ore. Our assay doesn't show a trace and I believe the Government assay shows a trace. Our slag covers six-tenths of one per cent of copper to waste.

Judge TILSON: What was the advantage of getting it, if you didn't want gold and silver?

The WITNESS: We bought it for the purpose of supplying silicate flux to our smelter, and it is cheaper to buy gold ore and silver ore than it is to buy gravel.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

By Mr. ISRAEL:

Q. What happens to the silicate?—A. The silicate combines with the iron and other bases in the charge.

Judge TILSON: Where does the iron come from?

The WITNESS: From our concentrates. May I elaborate a little bit? The purpose of our smelting operation is to smelt scrap.

Judge DALLINGER: In order to recover copper?

The WITNESS: Right.

Judge DALLINGER: That is all you care about, copper?

The WITNESS: That is right. Well, of course, all of these copper materials have some silver and gold as a by-product—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Judge DALLINGER: As I understand you to say, you paid $18.00 per ton for this and recover $21.00 silver and gold.

By Mr. ISRAEL:

Q. Does that take into consideration your plant cost of smelting each ton?—A. No.

Q. How much is this?—A. Our plant cost is $7.31.

Q. Per ton?—A. Yes.

Q. Which makes a net loss of how much on each ton?—A. A net loss of $4.56.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. This material has been referred to as a siliceous fluxing material. It has also been invoiced as a silver ore. In your opinion, is it a silver ore, or is it a

siliceous fluxing material; a crude mineral substance?—A. It is a siliceous fluxing material. We bought it as a siliceous fluxing material.

\*     \*     \*     \*     \*     \*     \*

Q. Is it a metallic mineral substance in the crude state?—A. Yes.

Judge DALLINGER: As a result of your experience, the thing can be an ore, and at the same time, be a crude mineral substance? Is that right?

The WITNESS: Yes, sir.

On cross-examination the witness testified in part as follows:

By Mr. FITZGIBBON:

X Q. I show you a paper and ask you if that is your signature?—A. That is.

X Q. Do you recognize it?—A. Yes.

X Q. It is an affidavit, is it not?—A. Yes.

X Q. Sworn to by you?—A. Yes, sir.

X Q. In which you say this material is a silver ore, is it not?—A. Yes, sir.

The affidavit, which is attached to the official papers in the case, was then admitted in evidence and it reads as follows:

PHILIP B. SCOTT, being duly sworn, deposes and states that he is connected with the copper smelting plant of the NICHOLS COPPER COMPANY, located at Laurel Hill, New York, in the capacity of Metallurgical Engineer; that he is familiar with the treatment of Antofagasta Silver Ore at the said plant, and that in the course of processes through which the silver ore pass in the said plant, any zinc contained in the ore passes off in the fumes or is carried away in the slag, and from said slag no zinc is recovered by this or any other company.

The deponent further states that no zinc was recovered by this or any other company from the bulk Antofagasta Silver Ore, weighing 1, 558,404 lbs. Customs Entry No. *25223*, Nichols Copper Company's Lot No. 138, 139, 140, 141, which arrived in New York Feb. 27, 1936, and which were received at the plant of the Nichols Copper Company Mar 4-5-7, 1936 having arrived there from Antofagasta ex S/S ANTOFAGASTA. The zinc has disappeared in the process connected with the treatment of said silver ore at the said plant.

In spite of the fact that the merchandise herein was described in the invoice and by the only witness called by the plaintiff who was a qualified metullurgical engineer as an ore, the plaintiff in his exhaustive brief herein seriously contends that said merchandise is not a zinc-bearing ore within the meaning of paragraph 393 of the Tariff Act of 1930. In support of this contention he cites cases holding that the court is not bound by statements in the invoice or even by the conflicting testimony of witnesses, but may take judicial notice of dictionary definitions in determining the common meaning of words in tariff acts.

It is true that some of the definitions cited by counsel define ore as a metal-bearing substance from which a metal can be extracted at a profit. But that is not the only definition. In Webster's New International Dictionary ore is thus defined:

1. a. A native compound containing one or more metals; sometimes, also, a native metal or even a valuable native nonmetal, as sulphur. b. *Mining* Any material containing valuable metallic constituents for the sake of which it is mined and worked; as, *cinnabar* is an *ore* of mercury; gold-bearing quartz is a

gold *ore;* also, material mined and worked for nonmetals; as, pyrites is a sulphur *ore.* The term *ore* has usually been applied, among miners, to the crude material obtained *without other than hand sorting* of the lumps; but where mechanical concentration is practiced at the mine the concentrates are often called *ore.* Waste may of course contain valuable constituents and may, owing to improved processes, itself become ore.

While the merchandise at bar was not smelted primarily for the purpose of obtaining the silver and gold contained therein and which were actually recovered, nevertheless said merchandise certainly comes within the meaning of a "material mined and worked for nonmetals,"— in this case the 60 per centum of siliceous material. While the silver and gold recovered in the smelting process did not pay the entire cost of the merchandise plus the cost of smelting, nevertheless, presumably it was profitable to use the merchandise herein as a flux in smelting for copper, and the value of the silver and gold incidentally recovered was clear profit.

The fact that in the instant case the only qualified witness testified that the merchandise here was a siliceous silver-bearing ore not only does not contradict the invoice description but corroborates the same. Inasmuch as the ore in question admittedly contains 10 per centum of zinc, that fact confirms the correctness of the collector's classification of the merchandise as a zinc-bearing ore. As such, it certainly falls within the sweeping provision for "zinc-bearing ores of all kinds" in said paragraph 393.

It is significant that the proviso to said paragraph limiting the imposition of duty thereunder to the zinc actually recovered applies only to lead or copper ores. The merchandise at bar is neither a lead nor a copper ore, since it contains only a slight trace of copper and a negligible amount of lead. It is decidedly a siliceous silver-bearing ore, as testified to by the only qualified witness in the case. We have carefully read the decision in *American Smelting & Refining Co.* v. *United States*, T. D. 48424, 70 Treas. Dec. 72, and in *American Smelting & Refining Co.* v. *United States*, Abstract 22178, 62 Treas. Dec. 1018, and in our opinion neither decision is here applicable.

Upon the established facts and the law applicable thereto we hold that the merchandise at bar is a zinc-bearing ore within the meaning of paragraph 393 of the Tariff Act of 1930, and is properly dutiable thereunder at the rate of 1½ cents per pound on the zinc contained therein, as classified by the collector, whose classification is hereby affirmed. All claims of the plaintiff are therefore overruled and judgment will be rendered accordingly.